IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| PEPSI-COLA BOTTLING COMPANY | ) | |
| OF PITTSBURG, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No.  07-2315-JPO |
| | ) | |
| v. | ) | |
| | ) | |
| BOTTLING GROUP, LLC, | ) | |
| d/b/a PBG, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

### I.   Introduction

The plaintiff, Pepsi-Cola Bottling Company of Pittsburg, Inc. ("Pittsburg Pepsi"),

filed this action seeking declaratory and injunctive relief to enforce a settlement agreement

that resolved a prior lawsuit with the defendant, Bottling Group, LLC ("Bottling Group").

This case is now before the court[1] on plaintiff's motion for partial summary judgment **(doc.**

**52)** and defendant's motion for summary judgment **(doc. 54)**.  The instant motions have

been fully briefed (*see* docs. 53, 55, 60-61, & 67), and the court is now ready to rule.

---

[1]On February 7, 2008, by consent of both parties, this case was reassigned for
disposition from Hon. Julie A. Robinson, U.S. District Judge, to the undersigned U.S.
Magistrate Judge, James P. O'Hara (*see* doc. 50).

II.   Facts[2]

Plaintiff is a Pepsi-Cola soft drink bottler, and has an exclusive bottling appointment that gives it certain rights to sell Pepsi cola and other authorized soft drinks in its territory. Defendant is also a Pepsi-Cola bottler and has appointments from PepsiCo, Inc. ("PepsiCo") to sell Pepsi cola and other authorized soft drinks pursuant to a Master Anchor Bottling Appointment.   Plaintiff sued defendant and PepsiCo in a previous action regarding the alleged transshipment[3] of defendant's products into plaintiff's territory (the "Transshipment Action").[4]   Plaintiff, defendant, and PepsiCo settled the Transshipment Action by entering into a confidential settlement agreement dated October 12, 2006 (the "Settlement Agreement").

Neither plaintiff nor defendant has provided the court a copy of the Settlement Agreement, but they have stipulated it contains certain provisions.[5]   It is uncontroverted that the terms of the Settlement Agreement have not been formally modified or altered.   Under the Settlement Agreement, defendant and PepsiCo agreed, among other things, to pay

---

[2]Immaterial facts and those not properly supported by the record are omitted.  When necessary, additional facts are included in the analysis section of this memorandum and order.

[3]"Transshipment occurs when a product from one bottler is offered for sale in a territory for which another bottler has an [exclusive bottling appointment]."  *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241, 1250 (10th Cir. 2005).

[4]*Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*, Case No. 01-2009-KHV; *see also Pepsi-Cola Bottling Co. of Pittsburg, Inc.*, 431 F.3d 1241.

[5]Doc. 51, at 3-5.

plaintiff $800,000.

Paragraph 8 of the Settlement Agreement provides:

> Bottling Group agrees not to use Pepsi insignias, proprietary containers or bottles, uniforms, trucks or other indications that it is a Pepsi bottler when servicing accounts in Pittsburg Pepsi's territory. Bottling Group shall have 60 days following the execution of this Agreement to comply with this paragraph. When Bottling Group comes into compliance with this paragraph, it shall certify its compliance by e-mail notice to Pittsburg Pepsi and PepsiCo through their undersigned attorneys.

Paragraph 9 of the Settlement Agreement provides:

> Bottling Group agrees to take all reasonable steps to control transshipment into Pittsburg Pepsi's territory. Pittsburg Pepsi agrees to take all reasonable steps to assist Bottling Group in controlling transshipment into Pittsburg Pepsi's territory, including, without limitation, by (a) notifying Bottling Group within a reasonable period following Pittsburg Pepsi's discovery of transshipment; and (b) reasonably cooperating in any investigation by Bottling Group.

Paragraph 10 of the Settlement Agreement provides: "Pittsburg Pepsi will not file any further actions relating to transshipment against either PepsiCo or Bottling Group without first advising in good faith their respective business representatives in an effort to resolve the matter."

Paragraph 11 of the Settlement Agreement provides: "Bottling Group agrees to allow Pittsburg Pepsi to deliver its product to Imperial Coffee in Bottling Group's territory, solely for the convenience of that customer's warehouse operation and with the understanding and intent that such product will be resold only in Pittsburg Pepsi's territory at the customer's

Pittsburg accounts."

Paragraph 15 of the Settlement Agreement provides:

> In executing this Agreement, the undersigned understand that its terms are contractual and not a mere recital, and agree that they are not relying upon any statements or representation made by any other party or any of its representatives or agents concerning any thing or matter, but rely upon their own respective judgment and counsel.

Paragraph 16 of the Settlement Agreement provides:

> The undersigned agree that this document embodies the entire terms and conditions of the release and agreement described herein; that this document may be signed in counterparts; that all words, phrases, sentences, paragraphs, including the recitals hereto, are material to the execution hereof; and that all executed copies, whether signed in counterparts or otherwise, are duplicate originals, equally admissible in evidence.

Paragraph 17 of the Settlement Agreement states: "In making this settlement and in execution of this Agreement, all parties hereto have had their benefit and advice of their respective attorneys of record and by their execution hereunder demonstrate both their satisfaction and understanding of the terms recited herein."

Paragraph 18 of the Settlement Agreement provides that "it is understood and agreed that this Agreement shall not be subject to any claims of mistake of fact by any of the parties."

Plaintiff acknowledges defendant has a contractual right, pursuant to a bottling appointment with Cadbury-Schweppes America Beverages, to distribute Dr Pepper soft drink products within plaintiff's territory. Defendant delivers 2-liter bottles of Dr Pepper

into plaintiff's territory in vessels known as "shells" (also known as "flats" or "crates") that say "Pepsi." Shells are plastic items into which the 2-liter bottles are directly placed. Each shell holds eight 2-liter bottles. Defendant also uses pallets to transport 2-liter bottles of Dr Pepper to accounts in plaintiff's territory. The pallets are flat wooden or plastic items onto which shells are placed.

The shells and pallets defendant uses for Dr Pepper bear the words "Pepsi" and "Property of Pepsi Bottling Group" but do not contain the Pepsi globe logo. Specifically, the shells have the stylized name "Pepsi" or "Pepsi-Cola" and are the distinctive "Pepsi blue" in color. On the shells defendant has used at a Wal-Mart store within plaintiff's territory is a ® symbol near the bottom of the second "P" in "Pepsi." The pallets are also the distinctive Pepsi blue and say "Property of Pepsi-Cola" or "Property of Pepsi Bottling Group."

Shells and pallets are used to transport bottles from defendant's warehouse to stores, and they are left at the stores for purposes of back-room storage. Defendant's corporate representative, a unit manager, testified that defendant has used the Pepsi-labeled shells and pallets to sell Dr Pepper in plaintiff's territory for as long as she can remember. The shells defendant uses are the same or look very similar to the shells plaintiff uses.

Plaintiff filed this action contending defendant violated the Settlement Agreement by allowing Dr Pepper products to be delivered in shells that say "Pepsi" on them. Although plaintiff does not concede that other violations of the Settlement Agreement have not

occurred, plaintiff states that defendant's use of shells and pallets as to 2-liter Dr Pepper bottles is the most significant conduct which defendant concedes continues after the parties' settlement.

Defendant's finance manager stated that defendant would have to obtain 40,000 generic shells to replace the Pepsi-labeled shells currently used to deliver 2-liter bottles of Dr Pepper, at a cost to defendant of $121,960 over two years.  Defendant's corporate representative stated that, if ordered to do so, defendant would stop using the Pepsi name on the shells it delivers into plaintiff's territory, but defendant views that as unreasonable, costly, and unnecessary under the Settlement Agreement.

Plaintiff's president and his family have worked since 1936 to develop the value of the Pepsi name in plaintiff's territory.  However, plaintiff has not yet attempted to calculate any damages or loss of goodwill due to defendant's use of the Pepsi-labeled shells and pallets.  Plaintiff has not received any complaints from customers about defendant's use of Pepsi-labeled shells and pallets in plaintiff's territory.  But plaintiff's president stated that customers have asked plaintiff if it can provide Dr Pepper bottles and cans.  Although no documentary evidence was maintained, plaintiff's president has recited his knowledge of incidents where certain customers paid defendant instead of plaintiff because of confusion.

On June 20, 2007, plaintiff filed a petition in the District Court of Crawford County, Kansas, seeking enforcement of the Settlement Agreement.  Plaintiff alleged in its petition that it would be too difficult to determine the impact or damage to plaintiff's goodwill from

defendant using indicia of being a Pepsi bottler while selling Dr Pepper or other non-Pepsi products in plaintiff's territory.  Plaintiff also alleged these actions undermine it as the exclusive Pepsi franchisee in the Pittsburg, Kansas area, and therefore, monetary damages cannot be calculated as a remedy for the breach, entitling plaintiff to specific performance of the Settlement Agreement and/or for injunctive relief.  Defendant removed the case to this court on July 18, 2007.  Plaintiff timely moved to remand the case (doc. 5).  Judge Robinson denied the motion to remand on October 10, 2007 (*see* doc. 17).

### III.   Summary Judgment Standards

Summary judgment is appropriate if the moving party demonstrates there is "no genuine issue as to any material fact" and it is "entitled to judgment as a matter of law."[6]  In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[7]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[8]  An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[9]

The moving party bears the initial burden of demonstrating an absence of a genuine

---

[6] Fed. R. Civ. P. 56(c).

[7] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[8] *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[9] *Id.* (citing *Anderson*, 477 U.S. at 248).

issue of material fact and entitlement to judgment as a matter of law.[10]   In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[11]   "On the other hand, if the movant has the burden of proof on a claim or defense raised in a summary judgment motion, it must show that the undisputed facts establish every element of the claim or defense."[12]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[13]   The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[14]   Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[15]   "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific

---

[10] *Id.* at 670-71.

[11] *Id.* at 671 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

[12] *Media Servs. Group, Inc. v. Lesso, Inc.*, 45 F. Supp. 2d 1237, 1239 (D. Kan. 1999).

[13] *Anderson*, 477 U.S. at 256; *see Adler*, 144 F.3d at 671 n.1 (concerning shifting burdens on summary judgment).

[14] *Anderson*, 477 U.S. at 256.

[15] *Adler*, 144 F.3d at 671 (internal quotation omitted).

exhibits incorporated therein."[16]

The legal standard does not change where, as here, the parties have filed cross-motions for summary judgment.[17]  "Each party has the burden of establishing the lack of a genuine issue of material fact and entitlement to judgment as a matter of law."[18]  When considering cross-motions for summary judgment, "the court is entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts."[19]  Further, "[c]ross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another."[20]

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut," rather, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'"[21]

---

[16] *Id.*

[17] *City of Shawnee, Kan. v. Argonaut Ins. Co.*, 546 F. Supp. 2d 1163, 1172 (D. Kan. 2008).

[18] *Id.*

[19] *Id.* (quoting *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000)).

[20] *Id.* (quoting *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979)).

[21] *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

IV.   Analysis

As contemplated during the January 31, 2008 pretrial conference and memorialized in the pretrial order,[22] the parties filed cross-motions for summary judgment on two primary issues: (1) whether paragraph 8 of the parties' Settlement Agreement is ambiguous as a matter of law, such as would allow the court, during trial, to admit parol evidence concerning the meaning of said contract language; and (2) whether plaintiff, assuming it is unable to present direct evidence of damages suffered as a result of defendant's alleged breach of the Settlement Agreement, is still entitled to its requested non-monetary relief of specific performance and/or equitable relief.[23]   The parties agree Kansas law applies in this diversity matter.[24]

A.      Ambiguity of Paragraph 8 of the Parties' Settlement Agreement

Under Kansas law, a written settlement agreement is a contract and is therefore subject to rules of construction that govern written contracts.[25]   Construction of a written contract is a matter of law to be determined by the court.[26]   "The primary rule in interpreting

---

[22]*See* doc. 51, at 29-30.

[23]Plaintiff notes that it understood the court desired dispositive motion briefing limited to these two issues but did not preclude further briefing after the instant motions are ruled.  Doc. 53, at 2 n.1.

[24]Doc. 51, at 2, para. 3(d).

[25]*Speiss v. Meyers*, 483 F. Supp. 2d 1082, 1091 (D. Kan. 2007).

[26]*Fisherman Surgical Instruments, LLC v. Tri-anim Health Servs., Inc.*, 502 F. Supp. 2d 1170, 1179 (D. Kan. 2007).

written contracts is to ascertain the intent of the parties."[27]  If the terms of a contact are clear, the rules of construction are not needed, and the intent of the parties is determined from the contract itself.[28]  In construing a contract, "meaning should be ascertained by examining the document[] from all corners and by considering all of the pertinent provisions, rather than by critical analysis of a single or isolated provision; and reasonable rather than unreasonable interpretations are favored."[29]

"Where a contract is complete and unambiguous on its face, the [c]ourt must determine the parties' intent from the four corners of the document, without regard to extrinsic or parol evidence."[30]  The facts and circumstances surrounding the execution of a contract become relevant only if the contract is ambiguous on its face and requires aid to clarify it.[31]

Whether a contract is ambiguous is a question of law.[32]  "Ambiguity exists if the contract contains provisions or language of doubtful or conflicting meaning" after giving

---

[27]*Liggatt v. Employers Mut. Cas. Co.*, 46 P.3d 1120, 1125 (Kan. 2002).

[28]*Id.*; *Forrest Energy, L.L.C. v. Seib*, No. 97,272, 166 P.3d 449, 2007 WL 2580517, at *4 (Kan. Ct. App. Aug. 31, 2007).

[29]*Fisherman Surgical Instruments*, 502 F. Supp. 2d at 1179.

[30]*Id.* (citing *Simon v. Nat'l Farmers Org.*, 829 P.2d 884, 887-88 (Kan. 1992)).

[31]*City of Manhattan, Kan. v. Galbraith*, 945 P.2d 10, 14 (Kan. Ct. App. 1997).

[32]*Fisherman Surgical Instruments*, 502 F. Supp. 2d at 1179.

the language a fair, reasonable, and practical construction.[33]  An ambiguity in a contract appears when the application of pertinent rules of interpretation to the face of the contract leaves it genuinely uncertain which one of two or more meanings is the proper meaning.[34] The court should use common sense and not strain to create an ambiguity in a contract where one does not exist.[35]

Defendant argues paragraph 8 of the parties' Settlement Agreement does not unambiguously bar its use of Pepsi-labeled shells and pallets while selling Dr Pepper in plaintiff's territory.  First, defendant argues the language in paragraph 8 does not specifically prohibit its use of shells and pallets.  Second, defendant argues that even if the court concludes that paragraph 8 covers shells and pallets, the language is ambiguous.  Although not explicit, defendant seems to argue that the language in paragraph 8 is ambiguous such that parol evidence should be considered in construing the provision.  Plaintiff argues that paragraph 8 unambiguously prohibits defendant's use of shells and pallets.

Initially, the court rejects any arguments by the parties based on evidence outside of the Settlement Agreement.  As stated above, extrinsic or parol evidence, including the facts and circumstances surrounding the execution of the Settlement Agreement, may only be considered if the court determines that an ambiguity exists in paragraph 8.  The court will

---

[33]*Liggatt*, 46 P.3d at 1125.

[34]*Id.* (citing *Catholic Diocese of Dodge City v. Raymer*, 840 P.2d 456, 459 (Kan. 1992)).

[35]*Forrest Energy*, 2007 WL 2580517, at *5.

therefore not consider any arguments regarding the history of defendant's use of shells and pallets or the facts surrounding the execution of the Settlement Agreement.

The provision at issue in paragraph 8 states that defendant "agrees not to use Pepsi insignias, proprietary containers or bottles, uniforms, trucks or other indications that it is a Pepsi bottler when servicing accounts in [plaintiff's] territory."  Plaintiff asserts that the Pepsi-labeled shells and pallets are prohibited under paragraph 8 in multiple ways, i.e., that they constitute "Pepsi insignias," "proprietary containers," and "other indications" defendant is a Pepsi bottler.  As earlier indicated, defendant argues its use of Pepsi-labeled shells and pallets is not specifically prohibited by paragraph 8.  But the court finds that paragraph 8 is clear and unambiguous such that rules of construction are not needed.  In an abundance of caution, however, the court will consider each of defendant's arguments relying on certain rules of contract construction.

1.    Sentence Construction

Defendant argues that the entire phrase "other indications that it is a Pepsi bottler when servicing accounts in [plaintiff's] territory" modifies the beginning of the provision. For instance, defendant states it is only prohibited from using Pepsi insignias that (i) indicate it is a Pepsi bottler (ii) when servicing accounts in plaintiff's territory.  Defendant argues this phrase inserts a degree of reasonableness into paragraph 8 since it only bans those items (including the specific ones mentioned) that would have the effect of indicating that defendant is a Pepsi bottler when servicing accounts in plaintiff's territory.

This phrase, however, is preceded by the disjunctive "or," which defendant fails to address. The court agrees with plaintiff that the provision contains a list of specific prohibitions in between two broader bans. That is, while servicing accounts in plaintiff's territory, defendant is prohibited from using "Pepsi insignias," "proprietary containers or bottles," "uniforms," "trucks," or "other indications that it is a Pepsi bottler."

As defendant acknowledges, courts should read meaning into all language in a contract. "Where faced with a choice of finding a contract term meaningless or meaningful, a court will opt for the latter."[36]  The court finds defendant's construction of the sentence unreasonable because it fails to give any meaning to the words "or other."  The court's construction that "other indications that it is a Pepsi bottler" is a separate ban, rather than a modification of all the bans, gives meaning to the words "or other."

2.     Lack of Specific Inclusion

Defendant correctly notes that the provision in paragraph 8 does not explicitly include shells or pallets, or their related terms, crates or flats.  Defendant argues that because the Settlement Agreement identifies other items, such as uniforms, trucks, and bottles, the failure to explicitly include shells and pallets indicates that the parties did not consider such items in drafting paragraph 8.  For support, defendant relies on a case stating: "In ambiguous contracts where there is uncertainty between the general and the specific provisions relating to the same thing, the specific provisions ordinarily qualify the meaning of the general

---

[36]*Stark v. Resolution Trust Corp.*, 856 F. Supp. 1509, 1513 (D. Kan. 1994).

provisions, the reasonable inference being that the specific provisions express more exactly what the parties intended."[37]

Here, though, there is no uncertainty between general and specific provisions relating to the same thing.  Further, defendant's cited authority does not support its argument that the inclusion of a general term indicates any intent by the parties for it not to encompass something more specific.  The court also flatly rejects defendant's argument that given its history of using Pepsi-labeled shells in plaintiff's territory, plaintiff knew about its use of shells and could have included the specific terms shells and pallets in paragraph 8 but failed to do so; indeed, if defendant truly intended at the time to continue the use of Pepsi shells in plaintiff's territory, defendant could have endeavored to make that clear by reciting a specific exclusion to the broad proscription of paragraph 8.

3.     Pepsi Insignias

The court next addresses defendant's argument that the prohibitions in paragraph 8 do not implicitly encompass shells and pallets.  Defendant argues that the prohibition of using "Pepsi insignias" does not apply to its use of shells and pallets.  Defendant notes that insignia is defined as "a distinguishing mark or sign."[38]  Defendant, however, encourages the court not to use the dictionary definition but to determine the meaning of insignias in light of the other language in paragraph 8.

---

[37]*Desbien v. Penokee Farmers Union Coop. Ass'n*, 552 P.2d 917, 923 (Kan. 1976).

[38]RANDOM HOUSE WEBSTER'S UNABRIDGED DICTIONARY 987 (2d ed. 1998).

Notably, defendant does not argue that its use of the shells and pallets do not constitute use of Pepsi insignias.  Rather, defendant merely relies on its argument addressed above that all the prohibitions in paragraph 8 apply only if they indicate it is a Pepsi bottler.  The court already rejected this argument.  Plaintiff argues that the Pepsi name is both a distinctive and characteristic mark of its owner, PepsiCo.  Defendant does not dispute this but once again simply relies on the "indications that it is a Pepsi bottler" phrase modifying the entire sentence.  Plaintiff also notes that the shells defendant uses display a registered trademark next to the Pepsi name.  The court therefore finds that the Pepsi and Pepsi-Cola names on the shells defendant uses in plaintiff's territory are Pepsi insignias under paragraph 8 of the Settlement Agreement.

### 4.    Proprietary Containers or Bottles

Defendant also argues that the prohibition of using "proprietary containers or bottles" does not apply to its use of shells and pallets.  Defendant notes that container is defined as "a receptacle (as a box or jar) for holding goods" or "a portable compartment in which freight is placed (as on a train or ship) for convenience of movement."[39]  Defendant admits that the dictionary definition, standing alone, could conceivably include a shell or pallet.

Defendant, however, encourages the court not to use the dictionary definition but to determine the meaning of containers in light of the other language of the contract, the facts

---

[39]Doc. 55, at 15.  The court notes that a container is also defined as "anything that contains or can contain something, as a carton, box, crate, or can."  RANDOM HOUSE WEBSTER'S UNABRIDGED DICTIONARY 438.

and circumstances of the case, and the nature of the soft drink bottling business.  Defendant cites to a legal encyclopedia and notes that "definitions from standard dictionaries and works on grammar are not to be used alone and without reference to the facts and circumstances of the particular case, and without reference to decided cases."[40]

Defendant ignored the case cited by the above-referenced secondary resource, which held that a word in a contract was ambiguous such that parol evidence should be considered in determining its meaning.[41]  Defendant also ignored the first sentence of its secondary resource, which says "[a]lthough definitions of words contained in standard dictionaries are not controlling in the judicial interpretation of contracts, they are generally accepted as the common meaning of the words."[42]  In any event, here "containers" is not ambiguous and the court will not reference the facts and circumstances of the Settlement Agreement's execution or the nature of the soft drink bottling business in determining its meaning.

Defendant argues that because "containers" is followed immediately by "or bottles," "containers" means containers that serve similar purposes as bottles, such as cans or other receptacles of soft drinks.  Defendant relies on the canon *ejusdem generis*, which provides that "where no intention to the contrary appears, general words used after specific terms are

---

[40] 17A Am. Jur. 2d *Contracts* § 357 (2008) (citing *Friedman v. Va. Metal Prods. Corp.*, 56 So. 2d 515 (Fla. 1952)).

[41] *Friedman*, 56 So. 2d at 517.

[42] 17A Am. Jur. 2d *Contracts* § 357.

to be confined to things . . . of the same kind or class as the things previously specified."[43] Defendant conveniently ignores the last sentence of its secondary resource, which states: "The rule has no application where words of general description do not follow words of particular description in relation to the same subject matter."[44] Defendant's cited canon does not support its proposition that the more general term "containers" must be confined to things of the same class as the more specific term "bottles," because the general term does not follow the specific term.

Regardless, shells and pallets are receptacles of soft drink bottles. Plaintiff argues that "containers or bottles" refer to broad categories of delivery vehicles. Defendant disputes plaintiff's argument by simply arguing that if "delivery vehicles" were intended to be prohibited, that term would have been included in the Settlement Agreement. The Settlement Agreement does define the word "containers," and no reason exists for the court to give it a meaning other than its dictionary meaning. The court finds that the shells and pallets defendant uses are considered containers under paragraph 8.

As defendant correctly notes, the use of all containers is not prohibited, just those that are "proprietary." Defendant states that the definition of proprietary is "of, relating to, or characteristic of a proprietor," "used, made, or marketed by one having the exclusive legal

---

[43]*Id.* § 364.

[44]*Id.*

right," or "privately owned and managed and run as a profit-making organization."[45]

Defendant argues the shells and pallets are not proprietary because plaintiff uses similar

shells and has admitted to taking defendant's shells. Defendant also states that it is not

unusual for a store to display one bottler's product (e.g., Coca-Cola) in the shell of a

competitor bottler (e.g., Pepsi). The court rejects defendant's arguments, which are based

on evidence outside the Settlement Agreement. In determining whether an ambiguity exists

in the Settlement Agreement, the court applies rules of interpretation to the face of the

contract. The court will not use evidence beyond the four corners of the Settlement

Agreement since it has not determined an ambiguity exists.

In its motion for summary judgment, plaintiff argues the shells and pallets use the

proprietary Pepsi name that is intended to be used only by the owner and its exclusive

franchises. Defendant did not address this argument. The court finds that the term

"proprietary containers or bottles" unambiguously encompasses the shells and pallets

defendant uses in plaintiff's territory.

5.    Other Indications Defendant is a Pepsi Bottler

Plaintiff argues that every time defendant uses the Pepsi name, it indicates it is a Pepsi

bottler. Defendant argues that its use of shells does not constitute an indication that it is a

Pepsi bottler. Defendant first argues the facts surrounding its delivery of Dr Pepper in the

shells indicate that it is a Dr Pepper or Coca-Cola bottler more than a Pepsi bottler.

---

[45]Doc. 55, at 15-16.

Defendant encourages the court to consider the context of its use of the shells, including that the shells arrive in a Dr Pepper truck and contain 2-liter Dr Pepper bottles, are carried to the store by a driver wearing a Dr Pepper uniform and hat, are delivered along with other sizes of Dr Pepper bottles and cans sitting in red Coca-Cola shells, and are intended for back-room storage. Defendant therefore concludes that it would be "absurd" to contend that the Pepsi-labeled shells indicate it was a Pepsi bottler.

Defendant also argues that because the shells are similar or identical to the ones used by plaintiff, defendant's use of the shells cannot indicate it is a Pepsi bottler. Defendant also states that plaintiff interprets paragraph 8 to prohibit defendant using a Pepsi pen while delivering Dr Pepper in plaintiff's territory. Defendant seems to compare its use of the shells to using a Pepsi pen to indicate that its use of the shells does not rise to the level of indicating it is a Pepsi bottler.

The court will not rely on defendant's context of the delivery of the shells when interpreting the provision. Notably, the provision prohibits "indications that [defendant] is a Pepsi bottler." Defendant apparently has construed the provision to prohibit actions that indicate it is *the* Pepsi bottler in plaintiff's territory and that it is *only* a Pepsi bottler, as opposed to being a Dr Pepper or Coca-Cola bottler. The provision is not so narrow. It prohibits *any* indication defendant is a Pepsi bottler, regardless of whether other facts indicate it is a Dr Pepper or Coca-Cola bottler. The court also rejects defendant's argument that its use of the shells is not prohibited because plaintiff uses the same or similar shells.

The provision is broader than just prohibiting actions that indicate defendant is *the* Pepsi bottler for the territory.

The court also is not persuaded by defendant's example of a Pepsi pen.  The court of course need not decide whether defendant using a Pepsi pen while delivering Dr Pepper in plaintiff's territory is prohibited because the issue is not before the court.  As stated above, however, the provision does not only prohibit indications that rise to the level of indicating defendant is *the* Pepsi bottler for the territory.  Defendant's use of the Pepsi-labeled shells is *an* indication that it is a Pepsi bottler, which is therefore prohibited under paragraph 8.

The court, having applied defendant's cited rules of interpretation to the face of the Settlement Agreement, finds that paragraph 8 does not contain provisions or language of doubtful or conflicting meaning and is therefore unambiguous as a matter of law. In construing an unambiguous contract "whose language is not doubtful or obscure, words used therein are to be given their plain, general and common meaning, and a contract of this character is to be enforced according to its terms."[46]  The court therefore finds that no extrinsic or parol evidence can be used in interpreting paragraph 8.  Based on the four corners of the document, the parties' intent in executing the Settlement Agreement was to prohibit defendant from using Pepsi-labeled shells while delivering Dr Pepper in plaintiff's territory.

---

[46]*Infohand Co. v. Sprint Spectrum, L.P.*, No. 05-2056, 2006 WL 3797347, at *3 (D. Kan. Dec. 18, 2006) (quoting *Wagnon v. Slawson Exploration Co.*, 874 P.2d 659, 666 (Kan. 1994)).

B.      Availability of Specific Performance as a Remedy

As stated above, the parties both seek summary judgment on the issue of whether

plaintiff, assuming it is unable to present direct evidence of damages suffered as a result of

defendant's alleged breach of the Settlement Agreement, is entitled to its requested non-

monetary relief of specific performance and/or equitable relief.  "A settlement agreement is

a type of contract and, therefore, is governed by contract law."[47]

1.      Specific Performance and Irreparable Harm

"Whether equity will decree the specific performance of a contract rests in the sound

judicial discretion of the court and it always depends upon the facts and circumstances of

the particular case."[48]  "Ordinarily there is no equity in releasing a party from a fair and

reasonable contract into which he freely entered unless the circumstances of the case require

it."[49]  In describing specific performance, the Supreme Court of Kansas stated:

> The remedy of specific performance is governed by the
> same general rules which control the administration of other
> equitable remedies.   In particular, therefore, when the party
> seeking specific performance of a contract establishes the
> existence of a valid binding contract, which is definite and
> certain in its terms and contains the requisite of mutuality of
> obligation, and is one which is free from unfairness, fraud, or
> overreaching, and enforceable without injustice upon the party
> against whom enforcement is sought, the court will, when the

---

[47]*Farm Bureau Mut. Ins. Co. v. Progressive Direct Ins. Co.*, 190 P.3d 989, 994 (Kan. Ct. App. 2008).

[48]*Hochard v. Deiter*, 549 P.2d 970, 973 (Kan. 1976).

[49]*Wilcox v. Wyandotte World-Wide, Inc.*, 493 P.2d 251, 256 (Kan. 1972).

> remedy at law for the breach of such contract is inadequate and
> the enforcement of specific performance will not be inequitable,
> oppressive, or unconscionable, or result in undue hardship,
> grant a decree of specific performance as a matter of course or
> right.[50]

A remedy at law is adequate and can defeat specific performance if it is as plain, complete, and efficient as the remedy of specific performance, and not circuitous or doubtful.[51]

Defendant argues that plaintiff cannot show it suffers irreparable harm from defendant's use of the Pepsi-labeled shells and pallets, which defendant alleges plaintiff is required to do to obtain specific performance.  Although plaintiff argues it is not required to show irreparable harm to obtain specific performance, it argues that it is suffering irreparable harm from defendant's conduct now and will continue to do so in the future.

Relying on cases interpreting federal law, defendant asserts plaintiff must show irreparable harm to obtain specific performance.[52]  In determining whether a preliminary injunction was appropriate, one court stated that:

> while irreparable harm is frequently found upon the breach of
> an exclusivity provision, that finding does not rest solely on the
> breach of the agreement and the resulting loss of exclusivity
> rights.  Rather, the irreparable harm findings are based on such
> factors as the difficulty in calculating damages, the loss of a
> unique product, and existence of intangible harms, such as loss

---

[50] *Hochard*, 549 P.2d at 973-74 (quoting 71 AM. JUR. 2D *Specific Performance* § 7).

[51] *Miller v. Alexander*, 775 P.2d 198, 204 (Kan. Ct. App. 1989) (quoting *Scott v. Sw. Grease & Oil Co.*, 205 P.2d 914, Syl. ¶ 6 (Kan. 1949)).

[52] *See Ireland v. Dodson*, No. 07-4082, 2007 WL 3232566, at *6 (D. Kan. Nov. 1, 2007); *Hoxeng v. Topeka Broadcomm, Inc.*, 911 F. Supp. 1323, 1336 (D. Kan. 1996).

of goodwill or competitive market position.[53]

Defendant acknowledges that irreparable harm can be shown when damages at law cannot adequately compensate the injury or cannot be reasonably measured.[54]  The case on which defendant relies also states that irreparable injury may be found where the subject matter of the contract is of such a special nature or peculiar value that damages would be inadequate.[55]  Although plaintiff encourages the court not to condition relief solely on whether plaintiff can demonstrate irreparable harm, it argues that money damages are inadequate.  The court therefore need not decide whether plaintiff must show irreparable harm, as argued by defendant, but will require plaintiff to show money damages would be inadequate.

Plaintiff relies on the Restatement (Second) of Contracts's factors for determining whether damages are inadequate, including: "(a) the difficulty of proving damages with reasonable certainty, (b) the difficulty of procuring a suitable substitute performance by means of money awarded as damages, and (c) the likelihood that an award of damages could not be collected."[56]  Plaintiff argues that it cannot obtain the substantial equivalent of defendant's promise not to use the Pepsi name to sell competing product.  Plaintiff argues

---

[53]*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1264 (10th Cir. 2004).

[54]*Ireland*, 2007 WL 3232566, at *6.

[55]*Id.* at *7.

[56]RESTATEMENT (SECOND) OF CONTRACTS § 360 (2008).

monetary damages are inadequate because it has no means to show a loss of actual sales from defendant's conduct and that the agreement also constrains future conduct.  Plaintiff states that since the conduct has continued for a long period of time, it has no baseline for comparison of sales without the practice.

Plaintiff also argues that defendant is infringing plaintiff's franchise license to use the Pepsi name to sell authorized Pepsi product in its territory.  Plaintiff argues it does not have a concrete form of damages because defendant's conduct is harming an intangible right and that it has fought to protect and develop the Pepsi name in its territory for many years.  Plaintiff argues that defendant ignoring its promise not to use the Pepsi name while delivering other products in plaintiff's territory is causing plaintiff to lose control over the brand name that it has built for itself and is damaging its goodwill and franchise integrity, all of which are valuable, irreplaceable, and immeasurable assets.

Defendant argues its use of Pepsi-labeled shells and pallets does not affect plaintiff's business in any way.  Defendant argues that even if some stores keep the shells with Dr Pepper in the public's view, as plaintiff alleges, plaintiff still cannot establish any injury.  Defendant notes that in addition to being unable to point to a decline in profits or sales, none of plaintiff's customers have complained to plaintiff or expressed confusion about the appearance of defendant's Pepsi-labeled shells in plaintiff's territory.

As defendant notes, plaintiff has not yet attempted to calculate any damages relating to sales or its goodwill.  Defendant relies on a case rejecting the testimony of a party's

president that damage done to goodwill could not be calculated when it was the only evidence of irreparable injury.[57]  The court in *Wichita Wire*, however, noted that most of the alleged damage to goodwill, the loss of a certain customer, already had occurred.[58]  The court also noted that the damage of loss of established business customers was insufficient to establish irreparable harm because it was easily calculated by determining the amount of business the defendant had conducted with the former customers.[59]  The court concluded that the "loss of identifiable customers, who had generated a known dollar amount of business, is a calculable injury which is insufficient to establish irreparable harm justifying the entry of a temporary injunction."[60]  The court finds the facts here distinguishable.  Plaintiff has not lost established business customers who generated a known amount of business.  Further, defendant's damage to plaintiff's goodwill continues to occur.

The court finds that defendant's conduct has damaged, and continues to damage, plaintiff's goodwill, ability to control its brand name, and its franchise integrity.  Monetary damages for these intangible harms would be difficult to ascertain with reasonable certainty and would not be a suitable substitute for specific performance.  The court notes that defendant's conduct has continued for years, making it even more difficult for plaintiff to

---

[57]*Wichita Wire, Inc. v. Lenox*, 726 P.2d 287, 291 (Kan. Ct. App. 1986).

[58]*Id.*

[59]*Id.*

[60]*Id.* at 292.

attempt to calculate damages.  The court finds that a remedy at law is inadequate, because it is not as plain, complete, and efficient as the remedy of specific performance.  A damages award would not be as complete or efficient a form of relief as specific performance, and the amount of the award would be doubtful.

The court flatly rejects defendant's argument that, rather than harming plaintiff, its use of Pepsi-labeled shells is free advertising to plaintiff.  This argument obviously ignores plaintiff's claim that defendant's conduct is taking advantage of plaintiff's goodwill to sell Dr Pepper.  For the reasons stated above, the court finds that damages are an inadequate remedy for plaintiff.

2.      Specific Performance of Settlement Agreements

Plaintiff argues that because of the public policy in favor of the settlement of controversies, it should not be required to show irreparable harm to obtain specific performance of the Settlement Agreement.  The case on which plaintiff relies interprets Iowa law and states that valid settlement agreements should be enforced, without the requirement of a showing of irreparable harm.[61]  Defendant acknowledges that courts generally favor and encourage settlement as a matter of public policy,[62] but argues that settlement agreements are contracts and are therefore governed by contract law.  The court agrees that although

---

[61]*Mid-America Real Estate Co. v. Iowa Realty Co.*, 385 F. Supp. 2d 828, 838 (S.D. Iowa 2005).

[62]*See In re Dep't of Energy Stripper Well Exemption Litig.*, 653 F. Supp. 108, 115 (D. Kan. 1986).

settlement is favored as matter of public policy, every settlement agreement should not be specifically enforced merely because it is a settlement agreement.

Plaintiff also argues that defendant should not be allowed to repudiate the Settlement Agreement and then argue there is no remedy for the breach.  The law favors compromise and settlement of disputes, and generally when parties enter into an agreement settling a dispute, neither party is permitted to repudiate it.[63]  Plaintiff simply implies defendant has repudiated the agreement but does not make any further arguments.  The court will therefore not decide whether defendant has repudiated the Settlement Agreement.

3.      Failure to Include Remedy in Settlement Agreement

The court rejects defendant's argument that if specific performance was truly important to plaintiff, it could have placed a clause to that effect in the Settlement Agreement.  Defendant further argues that because plaintiff chose not to include such a clause in the contract, the court should not allow plaintiff the benefit of a provision it did not include.  The court acknowledges that had a specific performance clause been included in the Settlement Agreement, the remedy would almost unquestionably be available to plaintiff.[64]  Defendant has failed to show, however, that specific performance is not available *unless* a clause to that effect is included in the contract.

---

[63]*Krantz v. Univ. of Kan.*, 21 P.3d 561, 567 (Kan. 2001).

[64]*See Thies v. LifeMinders, Inc.*, No. 02-2119, 2002 WL 31571258, at *10 (D. Kan. Nov. 6, 2002).

4.      Equitable Costs

Plaintiff argues that, in addition to specific performance, it should be awarded the costs defendant avoided by not complying with paragraph 8 to prevent unjust enrichment to defendant.  Defendant argues unjust enrichment is inappropriate because plaintiff cannot show that any savings to defendant would have accrued to plaintiff in a "but-for" scenario.  Defendant cites a case holding that unjust enrichment is based on the notion that a plaintiff in equity is entitled to what was promised to him but somehow accrued instead to the defendant.[65]

A typical case for unjust enrichment is when: (1) a benefit has been conferred upon the defendant by the plaintiff; (2) defendant appreciates or knows of the benefit; and (3) the acceptance or retention of the benefit by defendant under the circumstances makes it inequitable for the defendant to retain the benefit without payment of its value.[66]  Here, plaintiff is not seeking typical unjust enrichment damages but is seeking equitable costs of what defendant avoided by its noncompliance.

"[A] court sitting in equity may award monetary compensation in addition to specific performance where necessary to effectuate full and complete relief, to place the injured party in the position it would have occupied had there been no breach of contract."[67]  Such

---

[65]*See Sec. Benefit Life Ins. Corp. v. Fleming Cos.*, 908 P.2d 1315, 1322-23 (Kan. Ct. App. 1995).

[66]*Id.* at 1322.

[67]25 WILLISTON ON CONTRACTS § 67:32 (4th ed. 2008).

damages may be awarded to make the plaintiff whole.[68]  These damages are clearly different from those which would be awarded for breach of the contract in that they "are a method of compensation used to adjust the equities between the parties to place them in the position that they would have occupied if the contract had been timely performed."[69]

Plaintiff is therefore not required to show defendant's savings would have accrued to it in a "but-for" scenario.  The court finds plaintiff is entitled to monetary compensation to adjust the equities of the parties and place them in the position that they would have occupied had defendant timely stopped using the Pepsi-labeled shells and pallets in plaintiff's territory.  To place the parties in the position they would have occupied without the breach, the court finds plaintiff is entitled to the costs defendant avoided by not complying with paragraph 8.

5.      Breach of Contract Elements

The court rejects defendant's argument that because plaintiff does not have evidence of damages, it cannot establish its breach of contract claim.  As plaintiff states, defendant relies on breach of contract cases where monetary damages were at stake.  Defendant did not cite any cases where specific performance was sought but the court still required the plaintiff to show damages.

For the reasons stated above, the court finds that plaintiff, assuming it is unable to

---

[68]81A C.J.S. *Specific Performance* § 153 (2008).

[69]*Id.*

present direct evidence of damages suffered as a result of defendant's alleged breach of the Settlement Agreement, is still entitled to its requested non-monetary relief of specific performance and equitable relief in the form of the costs defendant avoided in failing to comply with paragraph 8.

## V.   Conclusion and Order

In consideration of the foregoing,

IT IS HEREBY ORDERED:

1.      Plaintiff's motion for partial summary judgment **(doc. 52)** is granted.

2.      Defendant's cross-motion for summary judgment **(doc. 54)** is denied.

3.      This case is not ready for a final judgment to be issued.  Both parties made clear that their motions and briefing were limited to the two issues discussed at the pretrial conference.  While the court's rulings strongly point in favor of a judgment for plaintiff, plaintiff's motion is only one for partial summary judgment.  Defendant should be given an opportunity to present its other defenses listed in the pretrial order, such as that plaintiff's claims are barred by its own misconduct, bad faith, and improper conduct; the doctrines of laches, unclean hands, release, estoppel, discharge, accord and satisfaction, unconscionability, and impracticability; unilateral and mutual mistake; plaintiff's breach of its contractual obligations; and that plaintiff did not mitigate its damages.  Further, plaintiff has indicated that defendant may be breaching the Settlement Agreement in additional ways. The only evidence as to the amount of an "unjust enrichment" award is defendant's finance

manager's estimate of the cost of obtaining generic shells, which is likely fairly strong evidence.  As there may still be some fact issues for a bench trial, a telephone status conference will be held to discuss these issues with counsel on **April 10, 2009, at 10:00 a.m.**  The court will initiate the conference call.

Dated this 30th day of March, 2009, at Kansas City, Kansas.


 s/James P. O'Hara
James P. O'Hara
U.S. Magistrate Judge